UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 18-cv-20922-BLOOM/Louis**

GE MEDICAL SYSTEMS S.C.S.,

      Plaintiff,

v.

SYMX HEALTHCARE
CORPORATION,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court upon Plaintiff GE Medical Systems S.C.S.'s ("Plaintiff") Motion to Enforce Settlement Agreement and for Entry of a Consent Judgment, ECF No. [21] ("Motion to Enforce"), and Defendant SYMX Healthcare Corporation's ("Defendant") Cross Motion to Reopen Case and Set Scheduling Conference, ECF No. [32] ("Motion to Reopen"), (collectively, the "Motions"). The Court held a four-day evidentiary hearing on the Motions. The parties submitted their proposed findings of fact and conclusions of law prior to the evidentiary hearing,[1] which they supplemented following the evidentiary hearing's conclusion. *See* ECF No. [99] (Defendant's Proposed Findings of Fact and Conclusions of Law); ECF No. [100] (Plaintiff's Proposed Findings of Fact and Conclusions of Law). The Court has carefully considered the Motions, all opposing and supporting submissions, the evidence and testimony presented during the evidentiary hearing, the record in this case, the applicable law, and is

---

[1] *See* ECF No. [61] (Defendant's Proposed Findings of Fact and Conclusions of Law); ECF No. [62] (Plaintiff's Proposed Findings of Fact and Conclusions of Law).

otherwise fully advised. Accordingly, the Court makes the following findings of fact and conclusions of law.

## I.   BACKGROUND & PROCEDURAL HISTORY

This case involves the parties' conduct relative to certain agreements between Plaintiff and Defendant for the purchase and installation of medical equipment for the Ridge Hospital in Accra, Ghana. Pursuant to the agreements, Plaintiff agreed to deliver purchased medical equipment and to provide certain services, such as installation and routine maintenance on the equipment, consistent with its standard limited warranties. Ultimately, Defendant purchased over $6.8 million of medical equipment from Plaintiff for the Ridge Hospital project. Yet, as summarized by the parties,

> [a] dispute arose between GE and SYMX concerning payment of certain of the Ridge Hospital Sales Agreements.
>
> . . . . GE claim[ed] that SYMX owe[d] GE an outstanding total amount of **USD $2,657,151.77** (the "**Outstanding Amount**") in connection with the Ridge Hospital Sales Agreements. GE filed a lawsuit related to its claims against SYMX entitled *GE Medical Systems S.C.S. v. Symx Healthcare Corporation*, U.S. District Court for the Southern District of Florida, case no. 18-cv-20922-CMA (the "**GE Lawsuit**").
>
> . . . . For its part, SYMX [] alleged claims against GE for costs related to the delivery of the equipment identified in the Ridge Hospital Sales Agreements, as well as claims that GE interfered with SYMX's relationship with Americaribe, Inc.[2] and others. SYMX filed a lawsuit related to its claims against GE entitled *Symx Healthcare Corporation v. GE Healthcare, Inc.*, Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, case no. 2018-001897-CA-01 (the "**SYMX Lawsuit**"). SYMX also [] alleged counter-claims against GE in the GE Lawsuit, including allegations that GE has caused SYMX to suffer lost business opportunity and lost profits.

ECF No. [21-1] at 2.

Nonetheless, in light of their long working relationship, the parties attempted throughout

---

[2] Americaribe is the wholly owned subsidiary of Bouygues Construction, "one of the largest construction companies in the world," and it awarded Defendant the Ridge Hospital project in March 2014. ECF No. [32] at 2.

2017 to negotiate mutually agreeable settlement terms regarding (1) Plaintiff's claims regarding Defendant's failure to pay the outstanding debt owed for the medical equipment delivered; and (2) Defendant's grievances against Plaintiff for certain costs that it incurred as a result of Plaintiff's untimely delivery of medical equipment. After extensive negotiations, Plaintiff ultimately agreed to reduce Defendant's outstanding balance in exchange for its prompt payment and to allow Defendant to pay its debt in installments, rather than Plaintiff's normal business practice of demanding payment in full. As such, by December 2017, the parties agreed that the final settlement amount would be discounted to $2,352,594.94, which would be paid by Defendant in five installments. Despite the parties' mutual agreement on the settlement amount and payment schedule, at the start of 2018, no settlement agreement had been signed and no payments had been made.

Instead, on January 19, 2018, Defendant filed suit in Florida state court for a declaratory judgment that it was not liable for the amount owed to Plaintiff for the Ridge Hospital equipment. Defendant claimed that Plaintiff had breached the sales contracts by missing delivery and installation deadlines and had tortiously interfered with Defendant's business relationships in Ghana.

Plaintiff subsequently filed this action on March 12, 2018, asserting breach of contract and account stated claims against Defendant for the failure to pay for the equipment that was delivered. Plaintiff sought to recover the full amount of the debt—namely, $2,657,151.77, plus interest. *See* ECF No. [1].[3] On April 13, 2018, Defendant filed its Answer, Affirmative Defenses, and Counterclaim, which asserted a compulsory counterclaim against Plaintiff for breach of contract for the failure to timely deliver the medical equipment. ECF No. [7].

---

[3] As discussed in more detail below, this case was originally assigned to the Honorable Cecilia M. Altonaga.

After initiating their respective lawsuits, the parties renewed their settlement negotiations and ultimately "reached a global agreement on settlement terms and conditions to resolve any and all disputes arising out of the Ridge Hospital Sales Agreements." ECF No. [21-1] at 2 ("Settlement Agreement" or "Agreement"). On May 4, 2018, Defendant sent Plaintiff a signed copy of the Settlement Agreement. ECF No. [91-35] at 47. On May 10, 2018, Plaintiff returned its counter-signed copy of the Agreement to Defendant. *Id.* at 65. Finally, on May 17, 2018, Defendant circulated a fully executed Settlement Agreement that was initialed by both parties. *Id.* at 83.

On May 14, 2018, the parties filed a Joint Motion for Enlargement of Deadlines Pending Settlement, ECF No. [15], explaining that,

> [s]ince the entry of the Court's scheduling order, the parties have reached a settlement agreement. The parties further agreed that within three (3) business days of the Effective Date of the Settlement Agreement or three (3) business days after the initial installment of the Settlement Payment clears GE's bank account, whichever is later, a notice of settlement would be filed in this action.
> Given that settlement is likely to be concluded, the parties jointly request a 30-day enlargement of the mediation scheduling deadline and the exchange of initial disclosures.

ECF No. [15] at 1. The next day, the Court administratively closed the case *sua sponte*, stating that "[i]f the parties fail[ed] to complete the expected settlement, either party [could] request the Court to reopen the case." ECF No. [16].

On January 25, 2019, Plaintiff filed its Motion to Enforce, seeking to enforce the parties' Settlement Agreement and obtain a consent judgment against Defendant pursuant to its terms. *See* ECF No. [21]. Defendant opposed Plaintiff's Motion to Enforce and requested that Plaintiff be sanctioned for allegedly making "knowingly false" statements to the Court during the course of the proceedings about whether Defendant had made any installment payments under the Agreement. *See* ECF No. [32]. Defendant contemporaneously filed its Cross-Motion to Reopen

within its response to the Motion to Enforce, which sought to reopen the case to allow Defendant to proceed with its claims against Plaintiff and add additional claims. *Id.*[4]

Plaintiff's Motion to Enforce was referred to the Honorable Chris M. McAliley, United States Magistrate Judge, for a Report and Recommendation. *See* ECF No. [33]. After extensive briefing by the parties, *see* ECF Nos. [21], [32], [39], & [40], Judge McAliley issued her Report and Recommendation, which was limited to Plaintiff's Motion to Enforce, *see* ECF No. [43] at 1 n.1 ("Report"). The Report set forth a thorough analysis of the facts and the applicable law and ultimately recommended that the Court grant Plaintiff's Motion to Enforce and issue the consent judgment against Defendant. *Id.* at 22-23. Both parties subsequently filed objections to the Report, and Defendant renewed its request for an evidentiary hearing. *See* ECF Nos. [47] & [48]. Upon review of the Report, the briefing, and the parties' objections, the Court determined that an evidentiary hearing was warranted in light of the numerous factual disputes and contractual ambiguities raised by the parties. *See* ECF No. [52].[5] Accordingly, the Court scheduled a two-day evidentiary hearing on the Motions.

On November 21, 2019, Judge Altonaga commenced the evidentiary hearing and heard testimony from two of Plaintiff's high-level executives: (1) the complete testimony of Chris Bonnett ("Mr. Bonnett"), the Managing Director of Project Development for GE Healthcare in Africa, and (2) the direct examination of Eyong Ebai ("Mr. Ebai"), GE Healthcare's General Manager for West and Central Africa. Upon the completion of Mr. Ebai's direct examination, the

---

[4] It is worth noting that, although styled as a reply, Defendant's Reply in Support of the Motion to Reopen, ECF No. [42], is effectively a sur-reply that readdresses the merits of Plaintiff's Motion to Enforce. The Court reminds the parties that, pursuant to the Local Rules in the Southern District, sur-replies are not permitted absent prior leave of Court. *See* S.D. Fla. L.R. 7.1(c)(1).

[5] The Court further indicated that "[i]f, after an evidentiary hearing, the Settlement Agreement is enforced against SYMX, SYMX will be required to pay GE's attorney's fees and costs." ECF No. [52] at 2 n.1.

hearing was recessed until the following day. *See* Tr. of Evidentiary Hr'g, Nov. 21, 2019 [hereinafter 1st Hr'g Tr.], ECF No. [78].

Shortly after the conclusion of the proceedings on November 21, 2019, Judge Altonaga filed a notice alerting the parties of her ownership of stock in the General Electric Company, which in turn owns Plaintiff. *See* ECF No. [66]; ECF No. [10] (Plaintiff's corporate disclosure statement). A telephonic hearing was held that evening to address Judge Altonaga's continued participation in this case. *See* ECF Nos. [67] & [68]. Ultimately, Judge Altonaga recused herself, ECF No. [69], and the case was reassigned to the Undersigned the following day, *see* ECF No. [70].

Following reassignment, this Court ordered that the parties confer and file a joint status report detailing the pending issues in the case. ECF No. [71]. Eventually, the evidentiary hearing was recommenced on June 11, 2020, Tr. of Evidentiary Hr'g, June 11, 2020 [hereinafter 2nd Hr'g Tr.], ECF No. [96]; and it continued on June 12, 2020, Tr. of Evidentiary Hr'g, June 12, 2020 [hereinafter 3rd Hr'g Tr.], ECF No. [97]; until its ultimate conclusion on June 15, 2020, Tr. of Evidentiary Hr'g, June 15, 2020 [hereinafter 4th Hr'g Tr.], ECF No. [98]. Over the course of the evidentiary hearing, Plaintiff presented Mr. Ebai's complete testimony, followed by the live testimony of its counsel of record, Ana M. Barton ("Ms. Barton"), and the sworn declaration of Ayele Locoh-Donou ("Ms. Locoh-Donou"), GE Healthcare's Africa General Counsel. Defendant then presented the testimony of Andrew Ramos ("Mr. Ramos"), President of SYMX.

Based on the extensive testimony and documentary evidence presented by the parties, the Court makes the following findings of fact and conclusions of law.

## II.   FINDINGS OF FACT

### A.  Settlement Negotiations

As explained above, the parties initiated settlement negotiations in 2017 to resolve their respective disputes arising from the Ridge Hospital project. Independently from these negotiations, throughout the end of 2017 and the beginning of 2018, Plaintiff repeatedly informed Defendant that most of the standard warranties on the medical equipment were set to expire in 2018, which meant that Plaintiff's ability to service the equipment would cease unless the parties executed a separate service contract. ECF Nos. [91-60], [91-22], & [91-18]. In mid-February 2018, after their settlement negotiations had been stalled, Plaintiff sent a letter to Defendant explaining again that the medical equipment at the Ridge Hospital would no longer be covered by the warranty and that, without a service contract, Plaintiff could no longer maintain, service, repair, or provide support for the equipment with expired warranties. ECF No. [91-20].

Mr. Bonnett and Mr. Ebai testified that Plaintiff was not willing to enter into a service agreement without a finalized settlement agreement and receipt of at least an initial settlement payment because it did not want to allow Defendant to incur additional debt without Defendant's good-faith effort to repay its outstanding debt. 1st Hr'g. Tr. 68:15-69:8, 74:15-75:8; 2nd Hr'g. Tr. 41:21-42:11. By March of 2018, Defendant reached out to Plaintiff to resume settlement negotiations, in part because it needed a new service agreement with Plaintiff for the Ridge Hospital equipment. ECF No. [91-21]; 3rd Hr'g. Tr. 95:20-97:5. Thus, settlement negotiations resumed at that time with an additional focus on resolving the service agreement issue.

Ultimately, on May 4, 2018, Defendant sent Plaintiff a signed copy of the Settlement Agreement. ECF No. [91-35] at 47. On May 10, 2018, Plaintiff returned its counter-signed copy

of the Agreement to Defendant. *Id.* at 65. Finally, on May 17, 2018, Defendant circulated a fully executed Settlement Agreement that was initialed by both parties. *Id.* at 83.

### B.  The Settlement Agreement

The parties' dispute stems from their conflicting interpretations of the language in the Settlement Agreement and their opposing positions on whether the Agreement became effective at all. On the one hand, Plaintiff contends that the Agreement became binding upon its execution on May 10, 2018. On the other hand, Defendant argues that the Settlement Agreement never became effective because it never made the first—or any—contractually required installment payment, which Defendant contends was a condition precedent to the formation of the parties' Agreement. Notably, however, neither party disputes the existence of the Settlement Agreement or the fact that it was extensively and freely negotiated and thereafter fully executed by all parties through their authorized representatives on May 10, 2018. The relevant provisions of the Settlement Agreement are set forth in full below.

The first line of the executed Settlement Agreement indicates that it was "made and entered into on this 4th day of May 2018 (the "**Effective Date**") . . . ." ECF No. [21-1] at 2.[6] Similarly, the last page of the Agreement states, "this Settlement Agreement has been entered into and executed by the Parties hereto through their duly authorized representatives, and is hereby delivered on the Effective Date." *Id.* at 4. Yet, paragraph (5), which is central to the parties' dispute, states, "**Duration**. This Settlement Agreement becomes effective upon payment of the first instalment payment," discussed below. *Id.* at 3.

---

[6] The original typewritten date on the executed Agreement is crossed out and the May 4, 2018, date is written in by hand and initialed by one of the parties. ECF No. [21-1] at 2. Likewise, with the exception of the signature page, every page of the Settlement Agreement is initialed by both parties, and each page of the attachments, aside from the one-page attachment for Annex 1, are also initialed by both parties. *See generally id.*

Paragraph (2) of the Settlement Agreement, which is titled "Consideration," provides that, "[a]s full and final settlement of the Parties' respective claims, the Parties agree to the following terms[.]" *Id.* at 2.

a. **The Settlement Payment and payment schedule**. SYMX agrees to pay to GE the sum of <u>**USD $2,325,594.49**</u> (the "**Settlement Payment**"). The Settlement Payment shall be made by wire transfer to GE's bank account, as per **Annex 3** of this Settlement Agreement, according to the following payment schedule and terms:

   i. 15 Calendar days from execution by both parties of this Settlement Agreement, SYMX shall pay **USD $480,000**. SYMX shall provide written proof of the wire payment made (via a SWIFT transfer) simultaneously upon its signature of the Settlement Agreement and the funds must clear into GE's bank account within seven (7) days following signature of the Settlement Agreement.

   ii. June 7, 2018, SYMX shall make a payment of **$468,148.50**.

   iii. July 9, 2018, SYMX shall make a payment of **$468,148.50**.

   iv. August 9, 2018, SYMX shall make a payment of **$468,148.50**.

   v. September 10, 2018, SYMX shall make a payment of **$468,148.50**.

   On each payment due date listed above, SYMX will immediately send to GE proof of the wire payment (SWIFT) corresponding to the instalment payment due on that given date.

b. **Event of Default by SYMX**. The Parties agree that time is of the essence with respect to completion of the payment schedule described above, and that the failure under any circumstance by SYMX to make any of the payments stated above, or by GE to receive the payments, on their respective due dates shall be deemed a material breach of this Settlement Agreement.

   In case of late or non-payment in relation to any of the payments above, GE shall provide written notice to SYMX, effective on delivery by federal express upon Andrew Ramos at 201 Alhambra Circle, Suite 605, Coral Gables, Florida 33134. SYMX shall have twenty (20) calendar days from such notice to cure its default and thereafter, GE reserves the right to:

   i. Call immediately upon SYMX for payment of any remaining amount of the Settlement Payment due and unpaid,

    ii.  Charge interest at a rate of 3% per annum on any unpaid amount of the Settlement Payment, and/or

    iii.  Undertake any legal action or claim before the U.S. District Court for the Southern District of Florida to collect payment of any remaining amount due. Any attorneys' fees and costs borne by GE in relation to any legal proceedings or claims shall be paid by SYMX if GE is the prevailing party.

SYMX further agrees that if it defaults on any of the above payment schedule deadlines, and the default is not cured within twenty (20) calendar days from GE's written notice of default, GE may obtain a consent judgment against SYMX in the amount corresponding to then-outstanding amount owed under the Settlement Payment upon filing an affidavit of service of notice of default and failure to cure.

c.  **Limited release**. Subject to full payment of the Settlement Payment by SYMX, the Parties agree that payment of the Settlement Agreement shall be deemed to be a full and final settlement with respect to the Outstanding Amount claimed by GE and all of its affiliates, parents, subsidiaries, and related entities both foreign and domestic, as well as any amounts or claims that have been, or could have been, asserted by SYMX against GE, including for costs arising out of delivery of the equipment identified in the Ridge Hospital Sales Agreements and interference with SYMX's relationship with Americaribe, Inc. and others, as described in the SYMX Lawsuit and the GE Lawsuit, whether known or unknown. SYMX will not have any further obligations towards GE with respect to payment of the Outstanding Amount if each of the payment terms listed above is satisfied, and likewise GE will not owe SYMX any amounts in connection with any claimed or unclaimed costs arising out of the Ridge Hospital Sales Agreements.

Upon SYMX's complete payment of the Settlement Payment, the Parties mutually release and discharge each other and each of their respective affiliates, parents, subsidiaries, and related entities (both foreign and domestic) of any and all claims, rights, demands, or set-offs that could have been brought in either the SYMX Lawsuit or the GE Lawsuit.

d.  **Dismissal of pending lawsuits**.

    i.  SYMX shall voluntarily dismiss the SYMX Lawsuit with prejudice within three (3) business days of the Effective Date of this Settlement Agreement.

    ii.  GE shall file a notice of settlement in the GE Lawsuit (and request that all case deadlines be stayed pending the settlement payment schedule) within three (3) business days of the Effective Date of this Settlement Agreement or three (3) business days after the initial instalment of the Settlement Payment clears GE's bank account, whichever is later. Upon SYMX's

      complete payment of the Settlement Payment, GE shall voluntarily dismiss the GE Lawsuit with prejudice, and SYMX will voluntarily dismiss its counter-claims in the GE Lawsuit with prejudice. In the event of default by SYMX of any of the Settlement Payment Instalments, GE may request that the Court presiding over the GE Lawsuit enter the consent judgment referenced above.

   e.  **Condition of future business**. Full and complete payment of the Settlement Payment shall be a condition precedent to GE's considering any future business relationship with SYMX, in particular for the sale, shipment, and/or installation of medical equipment upon commercially reasonable terms to be negotiated in good faith for Phase II of the Ridge Hospital in Ghana. As an exception, GE agrees to enter into a service agreement with SYMX for the Phase 1 equipment that has already been delivered by GE, **provided that** payment terms for any such future service agreement shall match exactly with those to be entered into between SYMX and its contractor. Payment is to be received by GE within seven (7) days from receipt by SYMX of each payment for service contract from its contractor.

*Id.* at 2-3.

Notably, the first installment payment described in paragraph (2) is tied to the date of the Agreement's execution by both parties and, as indicated above, it is undisputed that the Agreement was fully executed on May 10, 2018. *See, e.g.*, ECF No. [32] at 5; ECF No. [40] at 4; ECF No. [48] at 2; ECF No. [50] at 3; *see also* ECF No. [90-7]. Therefore, Defendant's first installment payment under the Agreement was due by May 25, 2018. *See* ECF No. [40-1] at 80-81.

Moreover, paragraph (4) of the Settlement Agreement, which addresses the service agreement on existing medical equipment, states:

      **Warranty and Maintenance**. GE agrees to provide the required warranty coverage stipulated in the document entitled "Ridge Hospital – GE Equipment Commissioning Dates," attached as **Annex 2** to this Settlement Agreement, and agrees to provide maintenance services for selected equipment based on the price quote previously provided by GE for the warranty period indicated in Annex 2. However, if at any point SYMX does not make any of the milestone settlement payments described in paragraph (2) above, GE reserves the right to suspend or terminate maintenance services to end-user sites as per the provision of the initial equipment sales contract.

ECF No. [21-1] at 3-4.

Finally, paragraph (9) states:

> **Terms Read and Understood**. Each of the Parties represents that it has carefully read and fully understands the terms, conditions, legal effects, and intent of this Settlement Agreement after consultation with independent legal counsel. Each Party acknowledges receipt of a copy of this Settlement Agreement before signing it and understands that every provision of this Settlement Agreement is contractual and legally binding.

*Id.* at 4.

### C. Post-Settlement Conduct

On May 10, 2018—the same day the Settlement Agreement was fully executed—Defendant reached out to Plaintiff about finalizing the service contract for the equipment at the Ridge Hospital. *See* ECF No. [91-28]. Mr. Ebai responded by e-mail on May 14, 2018, stating that Plaintiff was drafting the service proposal, but would not share it until "the settlement agreement is activated with a payment," referencing the first installment payment deadline of May 25, 2018. *Id*. This e-mail, and Mr. Ebai's explanation that his e-mail demonstrated his belief that the Settlement Agreement was binding at the time of execution, is consistent with Plaintiff's reluctance to allow Defendant to continue to incur more debt without first making any attempt to pay off the debt it had already incurred. 2nd Hr'g. Tr. 86:16-88:15. Defendant never suggested that the Settlement Agreement was not binding at the time of this e-mail. 2nd Hr'g. Tr. 89:15-25. Similarly, Mr. Ebai repeatedly reached out to Defendant after this correspondence to inquire about the timing of payment, and at no point did Defendant indicate that it was not bound to the terms of the Agreement.

On the same day, the parties filed their Joint Motion for Enlargement of Deadlines Pending Settlement, ECF No. [15], which quoted the language from paragraph (2)(d)(ii) of the Agreement, in order to stay any pending deadlines set by the Court, ECF No. [13]. Tellingly, on May 4, 2018, the day that Defendant executed the Settlement Agreement, it also dismissed its pending state court

action against Plaintiff with prejudice, consistent with its Settlement Agreement obligations. ECF No. [21-3]. Mr. Ramos's testimony explaining the dismissal with prejudice of the state court claims—namely, that he was not concerned that Defendant's claims in the state court action would be lost if the state court action was dismissed with prejudice—provides no additional support for Defendant's position that the Settlement Agreement was not binding at the time of execution. 4th Hr'g Tr. 62:25-65:18.[7] In fact, Defendant's dismissal with prejudice on the same day it executed the Agreement strongly suggests that Defendant understood its obligations under the Agreement to be enforceable.

On May 22, 2018, Mr. Ramos called Ms. Locoh-Donou and requested that Plaintiff agree to extend the deadline for the first settlement payment. ECF No. [91-35] ¶ 13. Mr. Ramos also put the request in writing, stating that he was giving "due notice" that he would be delayed "on the payment of $480,000[] that [would] become due on May 25th to [Plaintiff] in connection with the Settlement Agreement." ECF No. [91-27]. He cited delays on the availability of the letter of credit against which Defendant would draw funds to pay Plaintiff, but assured he was "fully committed to the resolution of [Defendant's] obligation with [Plaintiff]" and that the remaining payments would be timely made "according to the original schedule." *Id.*

When Defendant failed to make the first installment payment by May 25, 2018, Ms. Barton sent a default notice to Defendant and its counsel to trigger the 20-day cure period as set forth in the Settlement Agreement. *See* ECF No. [21-4]. Neither Defendant nor its attorney responded that the Settlement Agreement was not binding. 2nd Hr'g. Tr. 8:18-24. Ms. Barton ultimately sent default notices for every payment that was due under the terms of the Settlement Agreement. *Id.*

---

[7] Specifically, Mr. Ramos testified as follows: "[M]y understanding was that we were not going to lose our position with those other claims at that time. . . . I mean, my understanding was that . . . those claims were going to be added to the . . . federal case." 4th Hr'g Tr. 64:16-17, 65:16-18.

Instead, on June 12, 2018, three days before the cure period for the first defaulted payment was set to expire, Mr. Ramos called Mr. Ebai and requested that GE extend the deadline for Symx to cure its default and make the first installment payment, which Mr. Ebai denied. ECF No. [91-32]. Echoing Mr. Ramos's request to Mr. Ebai, on June 12, 2018, Defendant's attorney also wrote to GE's attorney:

> My client spoke to your client asking for a 30 day extension. There is a sizable letter of credit posted to guarantee payments to my client, but the draw scheduled has been extended due to documentation issues. A judgment against my client will ensure no one gets anything. On the other hand, my client intends to fully perform and has the ability it is solely an issue of timing. I am in trial this afternoon, we can discuss it tomorrow. In the meantime, my client is looking into the possibility of borrowing against the first draw per your client's suggestion.

ECF No. [91-39]. Defendant's attorney was referencing Plaintiff's ability to secure a consent judgment for Defendant's default. This request similarly evinces Defendant's understanding that the Settlement Agreement became binding upon execution.

On June 28, 2018, Plaintiff's credit control team in Ghana received an e-mail from GE Global Operations in which it first learned that Defendant had made a payment of $502,500.00 to a GE bank account in the United States. ECF No. [91-57]; 2nd Hr'g. Tr. 101:2-17. That payment was made on May 10, 2018 (the day the Settlement Agreement was fully executed) and was directed to "GE Medical Systems." ECF No. [91-58]. The reference number included in the wire did not match any purchase orders in GE's global system, making it difficult to properly assign the payment. 2nd Hr'g. Tr. 103:2-20.

From GE's receipt of the payment on May 10, 2018, to its contact with Plaintiff on June 28, 2018, GE Global Operations was unable to match the $502,500.00 payment to any existing purchase order. In addition, GE indicated that it does not engage in new business with clients that are in arrears, which added further confusion to its attempts to identify the intended recipient of

the payment. Thus, when it was notified of the payment on June 28, 2018, Plaintiff's team in Ghana believed that it was intended for the settlement debt. 2nd Hr'g. Tr. 104:24-105:16. Mr. Ebai further testified that he had no knowledge that Defendant was engaged with GE in another part of the world. 2ndHr'g. Tr. 105:18-23.

To ensure that the payment was based upon the Settlement Agreement, Mr. Ebai reached out to Mr. Ramos numerous times about the payment, and that it would be credited to the settlement debt. ECF No. [91-33]; 2nd Hr'g. Tr. 106:10-13, 107:5-10. Defendant never clarified that the payment was intended for a different GE entity. Neither Symx's counsel nor Mr. Ramos responded (during the calls or after) that the payment was not intended for the settlement.

In September 2018, Defendant's counsel called Plaintiff's counsel and again requested more time for Defendant to make the settlement payments and threatened bankruptcy if Plaintiff pursued a consent judgment. Moreover, Mr. Ramos and Defendant's counsel requested a meeting with Plaintiff and its counsel to discuss the issues between them. 3rd Hr'g. Tr. 17:24-22:16. The meeting occurred in October 2018, at which time Defendant first informed Plaintiff that the $502,500.00 payment was intended for a different project with Baptist Hospital in the Cayman Islands. 2nd Hr'g. Tr. 21:22-22:10. Neither Mr. Ramos nor Defendant's counsel mentioned a belief that the Settlement Agreement was not binding at this time.

## III.  CONCLUSIONS OF LAW

### A.  Enforcement of Settlement Agreements

"[A] district court has jurisdiction to enforce a settlement agreement, at least when one party refuses to abide by the agreement prior to dismissal of the action." *Kent v. Baker*, 815 F.2d 1395, 1400 (11th Cir. 1987); *see also Szanto v. Bistriz*, 743 F. App'x 940, 942 (11th Cir. 2018) ("[W]here the parties enter[] into a settlement agreement and then allege[] breach of the agreement

before dismissal—the district court retain[s] jurisdiction to enforce the terms of the settlement agreement"). "Settlement agreements are favored as a means to conserve judicial resources. Courts will enforce them when it is possible to do so." *Spiegel v. H. Allen Holmes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2002) (citing *Long Term Mgmt., Inc. v. Univ. Nursing Ctr., Inc.*, 704 So. 2d 669, 673 (Fla. 1st DCA 1997)). "A settlement is . . . intended to resolve litigation, not proliferate or protract it." *Matter of Blue Crest Holding Asset, Inc.*, No. 17-cv-21011, 2018 WL 2227739, at *10 (S.D. Fla. May 16, 2018) (quoting *Naumann v. Cambridge Tankers, Inc.*, 1988 AMC 1996, 1998 (E.D. Pa. 1988)). "To foster settlements, the settling parties must have legal assurance that the other party will not pursue any further litigation." *Sea-Land Serv. v. Sellan*, 64 F. Supp. 2d 1255, 1260 (S.D. Fla. 1999); *see also Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1487 (11th Cir. 1994) ("We favor and encourage settlements in order to conserve judicial resources. We cannot allow a litigant to attack the integrity of the settlement process by attempting to recharacterize the focus of his litigation after he decides he is unhappy with the settlement.").

The construction and enforcement of a settlement agreement is governed by the applicable state contract law. *Hayes v. Nat'l Serv. Indus.*, 196 F.3d 1252, 1254 (11th Cir. 1999); *see also Conte v. Winn Dixie Stores, Inc.*, No. 3:13cv463/MCR/EMT, 2014 WL 4693072, at *2 (N.D. Fla. Sept. 22, 2014) ("A motion to enforce the settlement agreement essentially is an action to specifically enforce a contract . . . ."). In this case, it is undisputed that Florida law governs.[8]

## B. Contract Interpretation

"To prove the existence of a contract, a plaintiff must establish: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Kolodziej v. Mason*, 774

---

[8] *See* ECF No. [21-1] at 4 ("**Governing Law**. This Settlement Agreement shall be governed by and construed in all respects in accordance with the laws of the State of Florida and each Party undertakes to irrevocably and unconditionally submit to the non-exclusive jurisdiction and venue of the Federal Courts of the State of Florida.").

F.3d 736, 740-41 (11th Cir. 2014) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th

Cir. 2009)) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)); *see also Don L. Tullis*

*& Assocs., Inc. v. Benge*, 473 So. 2d 1384, 1386 (Fla. 1st DCA 1985) ("To be enforced, the

agreement must be sufficiently specific and mutually agreeable on every essential element.");

*Gaines v. Nortrust Realty Mgmt., Inc.*, 422 So. 2d 1037, 1040 (Fla. 3d DCA 1982) ("Parties to a

settlement agreement must reach mutual agreement on every essential element of the proposed

settlement.").

> [M]utual assent is a prerequisite for the formation of any contract, *see Gibson v.*
> *Courtois*, 539 So. 2d 459, 460 (Fla. 1989) ("Mutual assent is an absolute condition
> precedent to the formation of the contract."); *Jacksonville Port Auth. v. W.R.*
> *Johnson Enters. Inc.*, 624 So. 2d 313, 315 (Fla. 1st DCA 1993) ("In order to create
> a contract it is essential that there be reciprocal assent to a certain and definite
> proposition." (internal quotation marks omitted)); *Barroso v. Respiratory Care*
> *Servs., Inc.*, 518 So. 2d 373, 376 (Fla. 5th DCA 1987) (noting that mutual or
> reciprocal assent must be proven to establish an oral contract).
> Mutual assent is not necessarily an independent "element" unto itself;
> rather, [courts] evaluate the existence of assent by analyzing the parties' agreement
> process in terms of offer and acceptance. *See Newman v. Schiff*, 778 F.2d 460, 465
> (8th Cir. 1985). A valid contract—premised on the parties' requisite willingness to
> contract—may be "manifested through written or spoken words, or inferred in
> whole or in part from the parties' conduct." *L&H Constr. Co. v. Circle Redmont,*
> *Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011) (internal quotation marks omitted).
> [Courts] use "an objective test . . . to determine whether a contract is enforceable."
> *See Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985); *see also* [*Leonard*
> *v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 128 (S.D.N.Y. 1999) (noting that the
> determination of whether a party made an offer to enter into a contract requires "the
> [c]ourt to determine how a reasonable, objective person would have understood"
> the potential offeror's communication), *aff'd*, 210 F.3d 88 (2d Cir. 2000)].

*Kolodziej*, 774 F.3d at 741 (footnote omitted); *see also Hanson v. Maxfield*, 23 So. 3d 736, 739

(Fla. 1st DCA 2009).

Thus, under this objective test, "the making of a contract depends not on the agreement of

two minds in one intention, but on the agreement of two sets of external signs—not on the parties

having meant the same thing but on their having said the same thing." *BP Prods. N. Am., Inc. v.*

*Oakridge at Winegard, Inc.*, 469 F. Supp. 2d 1128, 1133 (M.D. Fla. 2007) (quoting *Blackhawk*

*Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974)). Indeed, that an executed contract presents "difficulties of construction about which the parties disagree does not enable [them] to contend that the minds of the parties never met, since by signing the writing the parties bind themselves to such interpretation as the court may place upon the words and symbols employed by them." *Blackhawk Heating & Plumbing Co.*, 302 So. 2d at 408.[9] Additionally, a party seeking to enforce a settlement agreement "has the burden to prove assent by the opposing party and must establish that there was a meeting of the minds or mutual or reciprocal assent to certain definite" or essential terms. *U.S. Doe v. Health First, Inc.*, No. 6:14-cv-501-Orl-37DCI, 2017 WL 1929700, at *4 (M.D. Fla. May 10, 2017) (quoting *Giovo v. McDonald*, 791 So. 2d 38, 40 (Fla. 2d DCA 2001)).

> As a general proposition, "[w]here one contracting party signs the contract, and the other party accepts and signs the contract, a binding contract results." *D.L. Peoples Group, Inc. v. Hawley*, 804 So. 2d 561, 563 (Fla. 1st DCA 2002) (citing *Skinner v. Haugseth*, 426 So. 2d 1127, 1129 (Fla. 2d DCA 1983)); *see also Mandell v. Fortenberry*, 290 So. 2d 3, 7 (Fla. 1974) ("There is a presumption that the parties signing legal documents are competent, that they mean what they say, and that they should be bound by their covenants."); *Dodge of Winter Park, Inc. v. Morley*, 756 So. 2d 1085, 1085-86 (Fla. 5th DCA 2000) ("Generally, it is enough that the party against whom the contract is sought to be enforced signs it.").

*Rocky Creek Ret. Props., Inc. v. Est. of Fox ex rel. Bank of Am., N.A.*, 19 So. 3d 1105, 1108 (Fla. 2d DCA 2009).

Despite the preference for enforcing settlement agreements, courts must still ensure that a meeting of the minds occurred on all essential settlement terms before enforcing the parties' agreement. *Schlosser v. Perez*, 832 So. 2d 179, 182 (Fla. 2d DCA 2002) (citations omitted).

---

[9] Courts generally view a litigant's subsequent, inconsistent attempts to limit contractual language with skepticism, where the parties previously memorialized a written agreement on their meeting of the minds. *See Blackhawk Heating & Plumbing Co.*, 302 So. 2d at 408 ("A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto."). Such efforts are "not indicative of a lack of mutual assent," but rather seek to breach the settlement agreement. *Matter of Blue Crest Holding Asset, Inc.*, 2018 WL 2227739, at *12.

Further, settlement agreements are construed in accordance with the general principles of contract interpretation. *Robbie*, 469 So. 2d at 1385; *Williams v. Ingram*, 605 So. 2d 890, 893 (Fla. 1st DCA 1992). "The party seeking to enforce a settlement agreement bears the burden of showing the opposing party assented to the terms of the agreement." *BP Prods. N. Am., Inc.*, 469 F. Supp. 2d at 1133 (citing *Carroll v. Carroll*, 532 So. 2d 1109 (Fla. 4th DCA 1988)).

### 1. Plain Language

Under Florida law, it is well settled that, "[w]hen interpreting a contract, the court must first examine the plain language of the contract for evidence of the parties' intent." *Heiny v. Heiny*, 113 So. 3d 897, 900 (Fla. 2d DCA 2013) (quoting *Murley v. Wiedamann*, 25 So. 3d 27, 29 (Fla. 2d DCA 2009)).

> Provisions in a contract should be "construed in the context of the entire agreement" and read "in a way that gives effect to all of the contract's provisions." *Retreat at Port of Islands, LLC v. Port of Islands Resort Hotel Condo. Ass'n*, 181 So. 3d 531, 533 (Fla. 2d DCA 2015). Courts should not employ an interpretation of a contractual provision that would lead to an absurd result. *See Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014) ("Under Florida law, 'if one interpretation looking to the other provisions of the contract and to its general object and scope would lead to an absurd conclusion, such interpretation must be abandoned, and that adopted which will be more consistent with reason and probability.'" (quoting *Inter-Ocean Cas. Co. v. Hunt*, 189 So. 240, 243 (Fla. 1939))). On the other hand, "[i]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties," *Barakat v. Broward [Cnty.] Hous. Auth.*, 771 So. 2d 1193, 1195 (Fla. 4th DCA 2000), or, in the guise of interpretation, relieve a contracting party from the consequences of a bad bargain, *Prestige Valet, Inc. v. Mendel*, 14 So. 3d 282, 283 (Fla. 2d DCA 2009).

*Famiglio v. Famiglio*, 279 So. 3d 736, 740 (Fla. 2d DCA 2019); *see also Circuitronix, LLC v. Kapoor*, 440 F. Supp. 3d 1345, 1358-59 (S.D. Fla. 2020).

The "polestar guiding the court in the construction of a written contract is the intent of the parties." *Crastvell Trading Ltd. v. Marengere*, 90 So. 3d 349, 353 (Fla. 4th DCA 2012). "The intent of the parties to the contract should govern the construction of a contract. To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the

contract, and the object and purpose of the contract." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992); *see also Sugar Cane Growers Co-op. of Fla., Inc. v. Pinnock*, 735 So. 2d 530, 535 (Fla. 4th DCA 1999) ("In construing a contract, the legal effect of its provisions should be determined from the words of the entire contract."). "The Court may draw reasonable inferences from unambiguous contract language to determine what the parties intended." *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251-54 (S.D. Fla. 2017) (citing *Bombardier Cap. Inc. v. Progressive Mktg. Grp., Inc.*, 801 So. 2d 131, 134 (Fla. 4th DCA 2001)).

The "plain meaning" of words used simply means that they are "to be given their natural, ordinary meaning." *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251 (S.D. Fla. 2017) (quoting *Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1371 (S.D. Fla. 2016)). "In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). Florida courts have further explained that, "no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it . . . ." *Royal Am. Realty, Inc. v. Bank of Palm Beach & Tr. Co.*, 215 So. 2d 336, 338 (Fla. 4th DCA 1968). To that end, "Courts will generally strive to interpret a contract based on the definitions contained within the contract." *Fla. Inv. Grp. 100, LLC v. Lafont*, 271 So. 3d 1, 5 (Fla. 4th DCA 2019) (citing *Grant v. State Farm Fire & Cas. Co.*, 638 So. 2d 936, 937 (Fla. 1994)). "Where the parties to a contract take pains to define a key term specially, their dealings under the contract are governed by that definition." *Id.* (quoting *In re Blinds to go Share Purchase Litig.*, 443 F.3d 1, 7 (1st Cir. 2006)). Thus, where an agreement specifically sets forth defined terms, these contractual definitions will control. *Id.*

Similarly, courts are to "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000). "Where the terms of a written agreement are in any respect doubtful or uncertain . . . and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court[.]" *Blackhawk Heating & Plumbing Co.*, 302 So. 2d at 407 (citation omitted); *see also Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958) ("The intention of the parties must be determined from an examination of the whole contract and not from the separate phrases or paragraphs. Further, the actions of the parties may be considered as a [means] of determining the interpretation that they themselves have placed upon the contract." (citation omitted)); *Rafael J. Roca, P.A. v. Lytal, Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 5 (Fla. 4th DCA 2003) ("Where an agreement is ambiguous, the meaning of the agreement may be ascertained by looking to the interpretation the parties have given the agreement and the parties' conduct throughout their course of dealings."); *Mayflower Corp. v. Davis*, 655 So. 2d 1134, 1137 (Fla. 1st DCA 1994) ("Courts have also looked to the conduct of the parties throughout their course of dealings to determine their intentions and the meaning of the agreement.").[10]

---

[10] Indeed, under Florida law, courts apply the contract principle known as the "rule of validity," which

> holds that in the interpretation of contracts judges will presume that the parties intended a binding, valid agreement, at least in some respect, even if not in all that a party may claim. *See James v. Gulf Life Ins. Co.*, 66 So. 2d 62, 63 (Fla. 1953) ("Where the language of an agreement is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred."); *Bacon v. Karr*, 139 So. 2d 166 (Fla. 2d DCA 1962) (contracts duly executed for a lawful purpose should, if legally possible, be upheld); *City of Orlando v. Murphy*, 84 F.2d 531 (5th Cir. 1936) (when possible, contract should receive such construction as will uphold it, rather than render it nugatory). The law assumes that parties have made an agreement for some lawful, enforceable purpose, that courts should not apply a strained or unusual meaning so as to render it entirely unenforceable. *Diversified Enters. Inc. v. West*, 141 So. 2d 27 (Fla. 2d DCA 1962).

As noted above, the parties' dispute stems from their disagreement about whether the Settlement Agreement became binding upon its execution or after the completion of the first installment payment. In order to determine the intent of the parties in drafting the Settlement Agreement, the Court first looks to the plain language of the Agreement.

At the outset, the Court notes that the Settlement Agreement specifically defines the term "Effective Date,"[11] which is ordinarily understood to mean "[t]he date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect. This date sometimes differs from the date on which the instrument was enacted or signed." EFFECTIVE DATE, *Black's Law Dictionary* (11th ed. 2019). The Agreement further states that "[c]apitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement." ECF No. [21-1] at 2. Because "[c]ourts will generally strive to interpret a contract based on the definitions contained within the contract," *Fla. Inv. Grp. 100, LLC*, 271 So. 3d at 5, the Court considers the explicit use of the defined term Effective Date to be of great weight in its construction of the Settlement Agreement. *See Atl. Specialty Ins. Co. v. Pastukov*, 750 F. App'x 909, 911 (11th Cir. 2018) ("A contractual provision setting the date an agreement takes effect is consistent with Florida law, which recognizes that, '[g]enerally, the parties to a contract are competent to fix the effective date.'" (quoting *CNA Int'l Reinsurance Co., Ltd. v. Phx.*, 678 So. 2d 378, 380 (Fla. 1st DCA 1996))); *see also Hartford Ins. Co. of the Midwest v. Surrency*, 537 So. 2d 208, 208 (Fla. 5th DCA 1989) ("[P]arties can contract for a policy to begin on a particular date."). Similarly, the omission of "Effective Date" in the Duration clause suggests that the parties intended that provision to mean something other than "[t]he date on which a statute,

---

*J.R.D. Mgmt. Corp. v. Dulin*, 883 So. 2d 314, 316-17 (Fla. 4th DCA 2004) (some citations omitted).

[11] The Settlement Agreement indicates that it was "made and entered into on this 4th day of May 2018 (the "**Effective Date**") . . . ." ECF No. [21-1] at 2.

contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect." EFFECTIVE DATE, *Black's Law Dictionary* (11th ed. 2019). Further, the use of "Effective Date" in other provisions of the Settlement Agreement, such as paragraph (2)(d) on the dismissal of pending lawsuits, supports the interpretation that the obligations in the Agreement took effect independent of the first installment payment.

Moreover, paragraph (2) details mutual promises and consideration exchanged for the full and final settlement of the parties' disputes. *See* CONSIDERATION, *Black's Law Dictionary* (11th ed. 2019) ("Something (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something, esp. to engage in a legal act."). The provisions in paragraph (2) reflect the parties' respective obligations under the Agreement, which are notably unqualified by any conditional language.

First, under paragraph (2)(a), the schedule of installment payments is set forth in detail. The first installment payment is set to be due within "15 Calendar days from *execution* by both parties of this Settlement Agreement . . . ." ECF No. [21-1] at 2 (emphasis added). The plain language of this provision clearly links the first installment payment date to the parties' execution of the Agreement, not its Effective Date. Moreover, the mandatory language used in the installment payment provisions—namely, that Defendant "shall" pay each payment on the date specified—indicates that these payments are obligatory, rather than conditional as Defendant argues. Indeed, the United States Supreme Court has previously explained that the use of "the word 'shall' usually connotes a requirement." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1088 n.3 (2020) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. ——, ——, 136 S. Ct. 1969, 1977 (2016)). Thus, the use of this mandatory language forecloses any argument that a contracting party "merely has an elective 'right'" under the agreement, "but no duty to do so." *Id.*;

*see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (recognizing that "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion").

Likewise, the provisions in the Settlement Agreement that address default, which are set forth in paragraph (2)(b), provide further support for the mandatory, unqualified nature of Defendant's payment obligations. Specifically, the Agreement states that "the failure under *any* circumstance by SYMX to make *any* of the payments stated above, or by GE to receive the payments *on their respective due dates* shall be deemed a material breach of this Settlement Agreement." ECF No. [21-1] at 2-3 (emphasis added). Florida courts have defined the word "any" to mean "'one or another without restriction or exception;' often synonymous with 'either,' 'every' or 'all.'" *Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003) (quoting *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. 3rd DCA 1989)). As with the mandatory language of the installment payment provision, the default provision is explicit in requiring payment of every installment without any conditional language. In fact, the express requirement that each payment be received "on [its] respective due date[]" supports Plaintiff's interpretation that the Settlement Agreement became binding upon its execution, rather than upon payment of the first installment payment. "[T]he parties may enter into any contract they desire, and they are bound by the language of that contract . . . no matter how disadvantageous that language later proves to be for one party or the other." *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 704 (Fla. 2d DCA 2006).

Finally, as will be discussed below, the parties specifically agreed to a condition precedent in paragraph (2)(e), where any future business relationship was expressly conditioned on the full and complete payment of the Settlement Payment. The exclusion of any similar conditional

language in the Duration clause directly contradicts Defendant's position regarding when the Agreement took effect.

In sum, upon examining the plain language of the Agreement as a whole, the Court finds a consistent intent to create a binding agreement upon execution, and this overall language supports Plaintiff's position.

## 2.  Course of Performance

"Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100, 118 (1913).

> Contract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So. 2d 786, 788 (Fla. 4th DCA 1993). But "'Intention', as the term is used in connection with contracting parties . . . when not clearly expressed, may be demonstrated by conduct." *Smart v. Brownlee*, 195 So. 2d 4, 5 (Fla. 4th DCA 1967). In this vein, the Court may review the original contracting parties' post-contract course of performance of the agreement to interpret their intent. *See Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1336 (S.D. Fla. 1983) (citing Restatement (Second) of Contracts (1981) § 202(4), which provides "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"); *Downs v. United States*, No. 06-20861-CIV, 2010 WL 3222140, at *4 n.6 (S.D. Fla. Aug. 16, 2010) (citing *Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958)) ("[T]he actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract.") (also citing 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 32:14 (4th ed. 1999)) ("Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an important aid to the court."). . . .
>
> The Florida Supreme Court has adopted the principle of contract construction, which allows the Court to look to the parties' conduct in performing their contract to resolve the absence of a provision on access, finding,

Case No. 18-cv-20922-BLOOM/Louis

> Where the terms of a written agreement are in any respect doubtful
> or uncertain, or if the contract contains no provisions on a given
> point, or if it fails to define with certainty the duties of the parties
> with respect to a particular matter or in a given emergency, and the
> parties to it have, by their own conduct, placed a construction upon
> it which is reasonable, such construction will be adopted by the
> court, upon the principle that it is the duty of the court to give effect
> to the intention of the parties where it is not wholly at variance with
> the correct legal interpretation of the terms of the contract.

*Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407
(Fla. 1974).

*Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252-53 (S.D. Fla. 2017).

In this case, the parties' course of post-contract performance provides further support for the Court's conclusion that the Settlement Agreement became binding and enforceable upon its execution. Most notably, Defendant's actions reflect a consistent understanding that it was bound by the parties' Agreement. Indeed, Defendant's repeated requests for extensions of the payment deadlines, along with his former counsel's statement that "judgment against [Defendant] will ensure no one gets anything," evince a clear understanding that Defendant had an obligation under the Settlement Agreement to make the installment payments on the dates specified. *See* ECF No. [91-39]. Defendant's explanation that the requested extensions were reflective of its ongoing intent to resolve the parties' disputes is belied its consistent unwillingness to meet the terms of the Agreement.

Likewise, the Court does not find Mr. Ramos's testimony regarding the dismissal of the state court claims with prejudice to be credible. Specifically, Mr. Ramos testified that he was not concerned with dismissing the state court case with prejudice because his "understanding was that [Defendant was] not going to lose [its] position with those [state court] claims at that time," but he offered no justification for why Defendant dismissed those claims on the day it executed the Settlement Agreement, if it believed the Agreement was not yet binding. 4th Hr'g Tr. 64:16-17.

Rather, Defendant's dismissal with prejudice demonstrates its understanding that the contractual obligations were binding at the time of execution, not later.[12] Moreover, Defendant's failure to suggest at any point after the Settlement Agreement's execution that its payment obligation was a condition precedent to the formation of the Agreement is noteworthy, especially in light of Plaintiff's repeated and ongoing attempts to secure payment pursuant to the terms of the contract on the specified dates. "In other words, one party to a settlement is not required to be a mind reader or to know the private thoughts or intentions of the other party; rather, the parties need only agree on what they have actually said or expressed to each other." *In re Rolsafe Int'l, LLC*, 477 B.R. 884, 906 (Bankr. M.D. Fla. 2012).

The record in this case and the communications between the parties refute any suggestion that both parties were aware of the alleged condition precedent in the Duration clause. In particular, Defendant fails to provide any explanation for why, beginning on May 26, 2018, Plaintiff sent five separate notices of default to Defendant, based on the Settlement Agreement payment schedule. *See* ECF Nos. [91-37], [91-38], [91-41], [91-42], & [91-43]. Similarly, Defendant's failure to challenge or question these notices of default, based on its purported understanding that the Agreement was not yet binding, strongly suggests that the parties mutually understood that the Agreement was binding at the point of execution.

---

[12] The Court is also unpersuaded by Defendant's argument that Plaintiff understood that the Agreement would not take effect before Defendant made the first payment because it failed to file a Notice of Settlement in this action, as set forth in the Agreement. This argument ignores the clear and explicit language of paragraph (2)(d)(ii), which states that the notice of settlement "(and request that all case deadlines be stayed pending the settlement payment schedule)" would be filed "within three (3) business days of the Effective Date of this Settlement Agreement *or* three (3) business days after the initial instalment of the Settlement Payment clears GE's bank account, *whichever is later*." ECF No. [21-1] at 3. Obviously, Defendant's continued failure to make the first installment payment would, under this language, delay Plaintiff's obligation to file any notice of settlement. Any contrary interpretation merits no further discussion.

Additionally, Defendant's reliance on its communications with Plaintiff about securing a service agreement after the Settlement Agreement was executed fails to rebut the overwhelming record evidence of the parties' understanding that they had a binding and enforceable agreement as of its execution on May 10, 2018. These communications, when read in context, further substantiate Plaintiff's position that it was unwilling to allow Defendant to continue incurring new debt absent some good-faith effort to pay off its $2.3 million of existing debt. Moreover, the testimony presented by Plaintiff regarding its reasoning and consistent understanding throughout these interactions was both credible and consistent with the Agreement, the record evidence of the parties' conduct, and the communications.

"In considering expressions of agreement, the court must not hold the parties to some impossible, or ideal, or unusual standard. It must take language as it is and people as they are. All agreements have some degree of indefiniteness and some degree of uncertainty." *Blackhawk Heating & Plumbing Co.*, 302 So. 2d at 409. Here, the parties manifested their intent to enter into a binding and enforceable agreement through negotiating and executing the Settlement Agreement, and they reiterated this mutually agreed intent through their post-contract communications and course of performance. Upon a thorough review of the evidence and testimony presented, the Court concludes that these interactions provide a consistent narrative suggesting that each party agreed and understood its respective obligations under the Settlement Agreement.

### C. Condition Precedent

"A condition precedent represents an obligation to be performed before the contract is effective." *Biscayne Cove Condo. Ass'n v. QBE Ins. Corp.*, 971 F. Supp. 2d 1121, 1135 (S.D. Fla. 2013) (quoting *Allstate Floridian Ins. Co. v. Farmer*, 104 So. 3d 1242, 1246 (Fla. 5th DCA 2012)). Specifically, "[a] condition precedent is an act or event, other than a lapse of time, that must occur

before a binding contract will arise." *Mitchell v. DiMare*, 936 So. 2d 1178, 1180 (Fla. 5th DCA 2006) (citing J. Calamari & J. Perrilo, *Contracts*, § 11-5 (3d ed. 1987); Restatement (Second) of Contracts § 250 (1981)).

"A condition may be either a condition precedent to the formation of a contract or a condition precedent to performance under an existing contract." *Id.* "In the case of a condition precedent to *formation*, . . . the contract does not exist unless and until the condition occurs." *Id.* (emphasis added). Thus, "[n]o binding contract is formed when a condition precedent to its formation never occurs." *Surgical Partners, LLC v. Choi*, 100 So. 3d 1267, 1269 (Fla. 4th DCA 2012). On the other hand, "[i]n the case of a condition precedent to *performance*, a contract exists that may be enforced pursuant to its terms." *Mitchell*, 936 So. 2d at 1180 (emphasis added).

> While no particular words are necessary for the existence of a condition, such terms as "if", "provided that", "on condition that", or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise. In the absence of such a limiting clause, whether a certain contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties.
> However, where the intent of the parties is doubtful or where a condition would impose an absurd or impossible result then the agreement will be interpreted as creating a covenant rather than a condition. . . . "Because of their harshness in operation, conditions are not favorites of the law."

*In re Est. of Boyar*, 592 So. 2d 341, 343 (Fla. 4th DCA 1992) (quoting *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)).

Thus, "[a]s a general rule, conditions precedent are not favored, and courts will not construe provisions to be such, unless required to do so by plain, unambiguous language or by necessary implication." *Id.* (citing 17A Am. Jur. 2d *Contracts* § 471 (1991)); *see also Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 997 n.15 (11th Cir. 2012) (expressing "doubt that conditions precedent that are not expressly referenced by a written agreement may vary the explicit terms of a written agreement under Florida law" (citations omitted)); *Gunderson v. Sch. Dist. of*

*Hillsborough Cnty.*, 937 So. 2d 777, 779 (Fla. 1st DCA 2006) ("Provisions of a contract will only be considered conditions precedent or subsequent where the *express* wording of the disputed provision conditions formation of a contract and or performance of the contract on the completion of the conditions." (emphasis added)); *Gay v. Brencorp, Inc.*, No. 3:09-cv-1002-J-JBT, 2012 WL 162354, at *8 (M.D. Fla. Jan. 19, 2012), *aff'd*, 554 F. App'x 811 (11th Cir. 2014). Indeed, "[i]t is a principle of contract law that a mere stipulation or covenant in a contract will not be construed as a condition precedent, particularly where a forfeiture would result and where it appears a condition precedent, if desired, could have been provided for by express agreement." *In re Est. of Boyar*, 592 So. 2d at 344 (quoting *Palmquist v. Allardyce Petroleum Corp.*, 520 P.2d 783, 784 (Mont. 1974)).

Defendant argues that the Duration clause of the Settlement Agreement creates a condition precedent to the formation of the contract, which never occurred. As such, Defendant contends that a contract was never formed. However, upon reading the plain language of the Duration clause, in the context of the Settlement Agreement as a whole, it is clear that no condition precedent to the formation of the contract exists.

The Duration clause states that "[t]his Settlement Agreement becomes effective upon payment of the first instalment payment identified in paragraph (2) above." ECF No. [21-1] at 2. Keeping in mind that Florida law considers "the language used in a contract [to be] the best evidence of the intent and meaning of the parties," *Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp.*, 364 So. 2d 15, 17 (Fla. 4th DCA 1978), the Court finds no support in the express wording of the Duration clause for Defendant's position that the parties intended to create a condition precedent to the formation of a binding contract. *See Serra v. Saturn of Clearwater, Inc.*, No. 8:08-cv-856-T-33MAP, 2008 WL 5412213, at *4 (M.D. Fla. Dec. 29, 2008). The Court

will not infer such a condition in the absence of plain and unambiguous language. *Gunderson*, 937 So. 2d at 779 ("Provisions of a contract will only be considered conditions precedent or subsequent where the *express* wording of the disputed provision conditions formation of a contract and or performance of the contract on the completion of the conditions." (emphasis added)).

In contrast, the parties' express, unambiguous language in paragraph (2)(e) conditioned any future business on Defendant completing all installment payments required by the Agreement. *See* ECF No. [21-1] at 3 ("**Condition of future business**. Full and complete payment of the Settlement Payment *shall be a condition precedent* to GE's considering any future business relationship with SYMX . . . ." (emphasis added)); *see also Fla. Inv. Grp. 100, LLC*, 271 So. 3d at 4-5 ("A key principle of contract interpretation is that courts must not read a single term or group of words in isolation."); *Philip Morris Inc. v. French*, 897 So. 2d 480, 488 (Fla. 3d DCA 2004) ("Courts are required to construe a contract as a whole."). This language demonstrates the parties' ability to set certain conditional terms in the Settlement Agreement, and their decision not to do so in the Duration clause is fatal to Defendant's argument. *See Raban v. Fed. Exp.*, 13 So. 3d 140, 144 (Fla. 1st DCA 2009) (concluding that a contractual provision was not a condition precedent where the parties used express language elsewhere in the agreement to explicitly create a condition precedent but not in the provision at issue).

Accordingly, based on the language of the Settlement Agreement as a whole and that of the Duration clause, the Court concludes that the Duration clause did not create a condition precedent to contract formation. Instead, the Agreement became binding upon its complete execution by both parties.

### D. Material Breach of Contract

"To prevail on a breach of contract claim, a claimant must prove: (1) the existence of an enforceable contract; (2) a material breach of that contract; and (3) damages resulting directly from the material breach." *MDS (Can.), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1298 (S.D. Fla. 2011) (citing *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006)), *aff'd in part*, 720 F.3d 833 (11th Cir. 2013). Further, "[t]o constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.' [A party's] 'failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach.'" *MDS (Can.) Inc.*, 720 F.3d at 849 (quoting *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)); *see also O'Steen v. Wells Fargo Bank, N.A.*, No. 6:17-cv-849-Orl-31KRS, 2017 WL 4243564, at *3 (M.D. Fla. Sept. 25, 2017) ("An essential, or material, term is '[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'" (quoting *U.S. Doe*, 2017 WL 1929700, at *4)). For purposes of a breach of contract claim, Florida law requires that a material breach of a settlement agreement—i.e., the contract—be established by a preponderance of the evidence. *See Vega*, 564 F.3d at 1272; *Knowles*, 346 So. 2d at 1043.

> Under Florida law, failure to make a payment on time does not constitute *per se* a material breach of contract. Rather, to constitute a material breach, the late payment must occur where time is of the essence. *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 [(Fla. 4th DCA 2003)]. Time is of the essence under Florida law when (1) the agreement explicitly so specifies; or (2) such may be determined from the subject matter of the contract; or (3) treating time as non-essential would produce a hardship; or (4) notice has been given to the defaulting party requesting performance within a reasonable time. *Id.*

*Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005).

In this case, the Settlement Agreement explicitly included a time-is-of-the-essence provision. *See* ECF No. [21-1] at 2 ("The Parties agree that time is of the essence with respect to completion of the payment schedule described above, and that the failure under any circumstance by SYMX to make any of the payments stated above, or by GE to receive the payments, on their respective due dates shall be deemed a material breach of this Settlement Agreement."). Nevertheless, Defendant has repeatedly indicated that it did not make any payment under the parties' Settlement Agreement. *See, e.g.*, ECF No. [32] at 11; ECF No. [48] at 2. Having concluded that no condition precedent to the formation of the Settlement Agreement existed, and that the parties had a binding Agreement at the point of execution, the Court finds that Defendant materially breached the Agreement by failing to make any of the installment payments set forth in paragraph (2)(a). Accordingly, Plaintiff is entitled to the entry of a consent judgment, as set forth in the Settlement Agreement, for the full amount of the Settlement Payment—i.e., $2,325,594.49.[13]

**E.  Defendant's Request for Sanctions**

Finally, Defendant requests that sanctions be imposed against Plaintiff, pursuant to this Court's inherent power, for what it describes as Plaintiff's repeated and "knowingly false misrepresentations" to this Court that Defendant had made one payment toward the Settlement Agreement prior to Plaintiff filing its Motion to Enforce. Defendant takes the position that these purported misrepresentations were intentionally submitted to the Court, despite Plaintiff's knowledge that the payment at issue was intended to be applied toward a separate project in the Cayman Islands involving a different GE entity, in order to establish that the condition precedent to the parties' Agreement had been met. Plaintiff, however, argues that sanctions are unwarranted

---

[13] Although the parties spent significant amounts of time arguing about whether Defendant's $502,500.00 payment was intended for a project in the Cayman Islands or as a payment under the Settlement Agreement, the Court sees no need to address the issue, given Defendant's repeated statements throughout the course of these proceedings that no installment payment was ever made.

because the request for sanctions arises from disputed issues of fact and law, not from Plaintiff's allegedly frivolous or bad faith representations. Moreover, Plaintiff reiterates that, during these proceedings, it has consistently taken the position that Defendant made a payment to GE, which Plaintiff later credited to the Settlement Agreement debt. Plaintiff further notes that Defendant failed to object to that payment application, despite being repeatedly informed of the circumstances in written correspondence from Plaintiff's counsel.

Courts have the "inherent power to police those appearing before them." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). This power, "not conferred by rule or statute," allows courts "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citation and internal quotation marks omitted). A court may exercise its power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Purchasing Power, LLC*, 851 F.3d at 1223 (citation and internal quotation marks omitted). "In determining whether sanctions should be awarded under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006) (quoting *Rothenberg v. Sec. Mgmt. Co.*, 736 F.2d 1470, 1472 (11th Cir. 1984)).

Indeed, "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005).

> Bad faith can be found in several instances. First, bad faith may be found where the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled. Second, bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order. Third, the Eleventh Circuit has stated that bad faith may be found where an attorney knowingly or

recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.

*Barash*, 585 F. Supp. 2d at 1362 (citations and internal quotation marks omitted).

"In the context of inherent powers, the party moving for sanctions must show *subjective* bad faith. This standard can be met either (1) with direct evidence of the attorney's subjective bad faith or (2) with evidence of conduct 'so egregious that it could only be committed in bad faith.'" *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (citations omitted). Generally, where there is a factual dispute on the merits of a particular issue, the imposition of sanctions for a litigant's advancement of an "objectively frivolous claim" will typically be inappropriate. *See Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, No. 2:18-cv-356-FtM-29MRM, 2020 WL 533939, at *2 (M.D. Fla. Feb. 3, 2020); *see also Mitchell v. Int'l Consol. Cos.*, No. 11-cv-60403, 2014 WL 6997609, at *5 (S.D. Fla. Dec. 10, 2014) ("Rule 11 sanctions are not appropriate merely because factual disputes regarding allegations in a pleading exist."); *Cabrera v. Goodyear Tire & Rubber Co.*, No. 10-cv-21226, 2011 WL 535103, at *2 (S.D. Fla. Feb. 8, 2011) ("Although the affidavits by Mr. Flores and Mr. Galeano are probative evidence against the plaintiffs' claims, the parties' conflicting accounts of what happened simply demonstrate that there are fact disputes that, if resolved in favor of the plaintiffs, may allow them to prevail. In any event, the defendants have not met their relatively high burden of showing the lawsuit is so baseless in law or fact to justify [] sanctions.").

Yet, "absent direct evidence of subjective bad faith, this standard can also be met if an attorney's conduct is 'tantamount to bad faith,' meaning the 'attorney's conduct is so egregious that it could only be committed in bad faith.'" *Sutakovic v. CG RYC, LLC*, No. 18-cv-20125, 2018 WL 2766206, at *3 (S.D. Fla. June 8, 2018) (quoting *Purchasing Power, LLC*, 851 F.3d at 1224-25). "An attorney's conduct is 'tantamount to bad faith' if he 'recklessly raises a frivolous

argument.' 'Recklessness alone does not satisfy the inherent powers standard,' but 'recklessness

plus a frivolous argument suffice.'" *Id.* (quoting *Purchasing Power, LLC*, 851 F.3d at 1224-25).

"[B]ad faith conduct must be proven by clear and convincing evidence." *Brieva v. Freezing*

*Mech., Corp.*, No. 17-cv-22980, 2018 WL 5098978, at \*8 (S.D. Fla. Aug. 9, 2018), *report and*

*recommendation adopted*, No. 17-cv-22980, 2018 WL 5098876 (S.D. Fla. Aug. 28, 2018); *see*

*also Barash*, 585 F. Supp. 2d at 1365 (holding the movant to a clear and convincing evidence

standard of proof to establish conduct that would warrant the imposition of sanctions pursuant to

the court's inherent power). Ultimately, a court's inherent power to impose sanctions "must be

exercised with restraint and discretion" and used "to fashion an appropriate sanction for conduct

which abuses the judicial process." *Chambers*, 501 U.S. at 44-45 (citation omitted).

Upon review of the various filings in this case relating to the purported misrepresentations,

along with the evidence and testimony presented on the timeline of events and communications

exchanged between the parties about the $502,500.00 payment, the Court concludes that

Defendant has not adequately demonstrated that Plaintiff's representations amounted to bad-faith

conduct. Rather, the sequence of events supports the fact that Plaintiff had a good-faith basis for

its developing statements to the Court regarding whether Defendant had made any installment

payments under the Settlement Agreement. At a minimum, the following series of events, when

viewed as a whole, refute any contention that Plaintiff acted in bad faith: (1) A separate GE entity

received a $502,500.00 wire payment from Defendant on May 10, 2018—the same day that the

Settlement Agreement was fully executed—but GE Global Operations was unable to match the

payment to any existing purchase orders;[14] (2) Plaintiff's team did not learn of the existence of

Defendant's $502,500.00 payment until June 28, 2018,[15] after Plaintiff had already filed its first

---

[14] *See* ECF No. [91-58]; ECF No. [91-57]; 2nd Hr'g Tr. 100:3-105:23.
[15] *See* ECF No. [91-57]; 2nd Hr'g Tr. 100:3-105:23.

Motion to Reopen the Case on June 19, 2018;[16] and (3) Plaintiff then sent Defendant numerous communications and letters of default for the remaining defaulted installment payments, all of which noted that it intended to apply the payment to Defendant's outstanding settlement debt, but Defendant never responded or attempted to clarify the intended use for the $502,500.00.[17] Defendant ultimately informed Plaintiff in October 2018 that the $502,500.00 payment was intended for an ongoing project in the Cayman Islands. 3rd Hr'g Tr. 21-22:22:10.

The parties' respective arguments regarding the nature of the $502,500.00 payment, all of which are closely intertwined with their arguments on whether the Agreement became effective at the time of execution or upon Defendant's payment of the first installment payment, highlight the significant factual disputes at issue in this case. Yet, these factual disputes are clearly insufficient to satisfy the high burden required for a finding of bad faith. *See Skypoint Advisors, LLC*, 2020 WL 533939, at *2; *Mitchell*, 2014 WL 6997609, at *5; *Cabrera*, 2011 WL 535103, at *2. As such, the Court declines to exercise its discretion to impose sanctions in this case.

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Enforce Settlement Agreement and for Entry of a Consent Judgment, **ECF No. [21]**, is **GRANTED**.

2. **Within ten (10) days from the date of this Order**, Plaintiff shall submit a proposed consent judgment setting forth the total amount to be recovered, including interest.

3. **Within thirty (30) days from the date of this Order**, Plaintiff shall submit any request for an award of attorneys' fees and costs, along with the appropriate affidavits and documentation required under Local Rule 7.3.

---

[16] *See* ECF No. [17].
[17] *See* ECF Nos. [91-33], [91-41], [91-42], & [91-43]; 2nd Hr'g Tr. 113:16-22; 3rd Hr'g Tr. 21:22-22:10.

Case No. 18-cv-20922-BLOOM/Louis

4.  Defendant's Cross-Motion to Reopen Case and Set Scheduling Conference, **ECF No. [32]**, is **DENIED**. Defendant's request that Plaintiff be sanctioned is **DENIED**. Moreover, Defendant's request to reopen this case in order to continue litigating the parties' claims is **DENIED AS MOOT**.

5.  The Clerk of Court shall **ADMINISTRATIVELY CLOSE** the case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 3, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record